IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 95-60006

Summary Calendar

CHARLES D. KELLY; THOMAS C. BABB

Plaintiffs-Appellees,

MARSHALL DURBIN FARMS, INC.

versus

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Mississippi
(93-CV-45)

March 1, 1996

Before HIGGINBOTHAM, DUHÉ, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

Charles Kelly and Thomas Babb claimed that their employer, Marshall Durbin, Inc., terminated them because of their age in violation of the Age Discrimination in Employment Act. After a three-and-one-half day trial, a jury agreed, but found that no willful violation of the ADEA occurred. The sole issue on this appeal by Marshall Durbin is whether the evidence was sufficient to

---

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

support the jury's verdict.  Having reviewed the entirety of the trial testimony in this case, we find that the evidence was sufficient as to both Mr. Kelly and Mr. Babb.  We therefore affirm.

We have recently outlined the approach proper approach to a challenge to the sufficiency of the evidence to support a plaintiff's verdict in an employment discrimination suit.  Under Rhodes v. Guiberson Oil Tools, No. 95-60006, "a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains."  In addition, and of special significance to this case, Rhodes teaches that "[a] jury may be able to infer discriminatory intent in an appropriate case from substantial evidence that the employer's reasons are false.  The evidence may, for example, strongly indicate that the employer has introduced fabricated justifications for an employee's discharge, and not otherwise suggest a credible nondiscriminatory explanation."

Because of the complicated nature of the facts surrounding the discharges and the nature of the industry in which the plaintiffs labored, we provide only a brief summary of the background facts in this case, and discuss further relevant facts in the context of our legal analysis.

I

Marshall Durbin is a manufacturer of poultry products. The business proceeded in part via an independent contractor relationship between Marshall Durbin and growers working on farms. Marshall Durbin in essence sold baby chicks, feed, vaccine, and other necessities to growers. The growers raised the chicks to a certain level of maturity. Throughout this time, "servicemen" paid by Marshall Durbin visited the farms frequently to assure that all was well with the chickens. Once the chickens reached a certain age, Marshall Durbin bought them back; it hired "catching crews," working under "live haul supervisors," to catch hundreds of chickens per night and haul them in trucks to plants for processing and eventual slaughter.

At the time of his termination, Mr. Kelly was a "broiler serviceman." A broiler is a certain type of chicken. At the time of his termination, Mr. Babb was a live haul supervisor.

## II

We emphasize at the outset that when the jury hears conflicting versions of events via oral testimony, its finding as to credibility, made in this case in the form of a plaintiff's verdict, is final. We pause to note this point because, despite the fact that we articulate it with a certain regularity, we receive with equal regularity appellants' briefs illustrating an inability to grasp its importance.

As is often the case in employment discrimination cases, the plaintiffs were able to provide little in the way of direct evidence of prohibited intent. The direct evidence that did exist

3

in this case came in the form of a comment by Mr. Charles McGee, head broiler serviceman and Mr. Kelly's immediate supervisor. McGee commented to another employee shortly after Mr. Kelly's termination that "older employees were less efficient that the younger men were." McGee had some role in Mr. Kelly's termination, although McGee's immediate superior made the ultimate decision.

The focus of this case, then, was on the plaintiff's attempt to prove pretext. We hold that the evidence in this case allowed the jury to conclude that the reasons Marshall Durbin asserted for the challenged discharges were pretexts for discrimination.

A. Mr. Kelly

The evidence with regard to Mr. Kelly's case allowed the jury to infer only one legitimate, nondiscriminatory reason for Mr. Kelly's discharge, namely, that a measure of performance called "formula costs" showed that Mr. Kelly was an ineffective employee.[1] Marshall Durbin's evidence tended to show that the cost per pound of chicken of Mr. Kelly's growers, the "formula cost," was among the highest in Marshall Durbin's business. Marshall Durbin calculated formula costs with statistical analyses of data tracking the amount of chicken produced by each grower against the costs associated with that grower's operations. To place the formula costs data in context, Marshall Durbin introduced unrebutted evidence that the regional operation at which both plaintiffs worked was losing money, that Marshall Durbin had brought in new

---

[1] Mr. Kelly proved a prima facie case. He was fired at age 59. His replacement was 26 years old.

4

upper level management in attempt to change the operation into a profitable one, and that this new management fired Mr. Kelly on the stated grounds of "poor performance" after giving him a single warning three weeks prior to his discharge that his performance had to improve in days, not weeks.

The jury could deem Marshall Durbin's formula costs rationale a pretext for discrimination for several reasons. First, the jury could find that formula costs were not an accurate measurement of broiler serviceman's job performance. Mr. Kelly's prior supervisor, Mr. Mullen, testified that different ingredients beyond the control of a serviceman determined the formula costs. These factors included grower pay (which depended on the nature of the contract between an Employer and a grower), the age of a grower's physical plant, and the type of equipment it used (especially the machinery used to control temperature). This testimony dovetailed with that of Mr. Kelly, who told the jury that many of his growers used less advanced equipment than that used by other growers. We note that allowing the jury to consider this evidence does not constitute judicial punishment for an irrational business decision. While an employer does not violate the ADEA by irrationally firing a productive worker, evidence establishing the irrationality of an employer's business decision may rebut an employer's business defense.

Second, the jury could find that Marshall Durbin itself did not measure the performance of broiler servicemen according to formula costs, at least not prior to the litigation. Mr. Mullen

5

testified that on numerous occasions the owner of Marshall Durbin told him not "to worry about [formula costs]" because "[t]hat is my problem. You just worry about doing a good job. Don't be concerned about that." Moreover, Mr. Kelly stated that, prior to his termination, his supervisors never discussed formula costs with him or informed him of their supposed importance. Even during the single warning occurring three weeks before Mr. Kelly's termination, Mr. Kelly's supervisor did not mention formula costs, and in fact gave him no indication at all as to the nature of his deficient performance.

Third, to the extent that formula costs were designed to be indicators of aspects of a grower's production that were in Mr. Kelly's control, testimony at trial showed that Mr. Kelly was a solid performer. Testimony at the trial, primarily from Mr. Kelly, contradicted Marshall Durbin's witnesses that dead birds, wet spots, and poor health practices abounded on Mr. Kelly's farms. Mr. Kelly testified on the basis of over twenty years experience in the poultry business, including many in which operations ran at a profit, that some of these difficulties simply did not exist, those that did were nothing unusual, and that he reported the existing problems to his supervisor in writing. Moreover, Mr. Mullen, Mr. Kelly's prior supervisor, described Mr. Kelly as an astonishingly dedicated performer willing to do any task at all, including those that could not possibly have been in his job description, in order to make the overall operation succeed. Mr. Kelly worked hours long enough to cause his wife to complain; he roused himself at odd

hours of the morning in order to repair broken down trucks; and he got the vote out on a bond issue important to Marshall Durbin's operation. In his twenty years of employment in the poultry business, he rarely if ever took a vacation.

The above evidence tended to rebut Marshall Durbin's formula costs rationale for Kelly's termination. But Kelly provided additional evidence supporting the jury's conclusion that something was amiss. The jury heard of the remark of Mr. Kelly's supervisor discussed above, as well as the flattering evaluation of Mr. Kelly's prior supervisor. Chief among the additional evidence, however, was testimony allowing the jury to conclude that Marshall Durbin falsified documents in an attempt to build a fake record of Mr. Kelly's poor performance. The clerical employee in charge of filing employment evaluations testified that several hand-written writings critical of Mr. Kelly found in his personnel file at the time of litigation were not present at the time of his termination, that she knew nothing of the existence of these writings at the time, and that she would have known had they in fact existed then.[2]

---

[2] Marshall Durbin asks us to disregard this evidence because, it alleges, the plaintiff made no argument to the jury regarding falsification of documents. St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742 (1993), forecloses this argument. The lesson of Hicks was that a finder of fact may conclude that a nondiscriminatory reason other than that given at the time of the challenged employment decision or during argument to the jury in fact motivated an employer. In other words, a jury may conclude whatever the evidence allows it to conclude, in spite of the arguments of counsel. We believe that the Hicks court did not intend to limit the application of this principle to cases in which it would benefit employment discrimination defendants.

We note also that defense counsel's statements to the trial judge at sidebar illustrated that he understood at the time what the clerical worker's testimony tended to prove.

Moreover, Mr. Kelly's former supervisor testified that Mr. Kelly's record should have contained several positive evaluations of his performance written during the several years he served Marshall Durbin as a broiler serviceman. Some of these records were missing from Marshall Durbin's files. Such evidence, if credited, allowed the jury to disregard Marshall Durbin's records. But it also provided evidence of Marshal Durbin's "mendacity" and allowed an inference that the defendant's falsification was designed to conceal prohibited intent.

Under such circumstances, we believe that a jury could infer that Marshall Durbin's formula costs rationale was a pretext for discrimination on the basis of Mr. Kelly's age.

B. Mr. Thomas Babb

Regarding the portion of the case relating to Mr. Babb, the evidence required the jury to decide two disputed issues of fact: first, whether Mr. Babb quit or was discharged; and second, whether Marshall Durbin fired Mr. Babb because of a reduction in force. To the extent that Mr. Babb's discharge took place as a result of a reduction in force, Marshall Durbin sought to justify the choice to terminate Mr. Babb, as opposed to either of two other live haul supervisors, on the grounds that Mr. Babb could not complete the required paperwork and that his crew-members lived the farthest away from the complex.

Regarding the first issue, the evidence was sufficient to allow the jury to conclude that Marshall Durbin fired Mr. Babb. The relevant discussion between Mr. Babb ended with Mr. Babb

8

stating, "James, don't lie to me. If you are firing me, tell me I'm fired," and the supervisor responding, "That's the way it is." Moreover, Mr. Babb's wife, upon a return to Marshall Durbin's office some three weeks after this conversation, asked the supervisor why Mr. Babb had been fired. The supervisor responded that he could not tell her the reason, not that he had never discharged Mr. Babb. No other conversations regarding Mr. Babb's continued employment took place. Under such circumstances, the jury could conclude that Marshall Durbin fired Mr. Babb.

The resolution of the second issue, whether Mr. Babb was fired as a result of a reduction in force, is more complicated and in some part dependant on our conclusion that Mr. Babb was in fact fired. In order to aid in our understanding of the conflicting testimony in this case, we summarize the relevant testimony in some detail.

The jury heard Marshall Durbin's version of the events surrounding Mr. Babb's termination primarily via the testimony of James McNally, who at the relevant time supervised Marshall Durbin's live haul supervisors. According to McNally, Marshall Durbin lost a buyer shortly before Mr. Babb and Marshall Durbin parted ways. At that time, Marshall Durbin operated three catching crews, one supervised by McNally himself, one by Babb, and one by a Mr. Sherrill Moore. Because of this loss, and as part of a more general and ongoing effort to make the business more efficient, Marshall Durbin restructured its operations. Under the new structure, one supervisor would oversee all catching crews; McNally

9

himself supervised during the day, and Moore took the night shift. The restructuring also reduced the number of catching crews from three to two. But, according to McNally and the other Marshall Durbin witnesses, no one was fired during this restructuring. The crew members that had operated under Mr. Babb's now dissolved crew remained on the crew list,[3] and McNally also offered Mr. Babb other jobs, including one as a dispatcher. Mr. Babb took a dim view of this offer and stormed out of the office.

Mr. Babb, however, testified that he received no offer of a different position from McNally. Rather, McNally fired him with little or no warning after the short conversation described above.

We must, of course, accept Mr. Babb's testimony that McNally never offered him a second job and that the termination was in fact rather abrupt. The more difficult question is whether the jury could also disregard the rest of McNally's testimony regarding the reorganization of the supervisor positions. In essence, Marshall Durbin asks us to find that no rational jury could refuse to believe an argument that was not its first defense at trial, namely, that a RIF, not a reorganization, took place. Under this story, Marshall Durbin's reorganization resulted in the elimination of one live haul supervisor position, and as a result, Marshall Durbin fired Mr. Babb. By casting this suit as a RIF case,

---

[3] Although no testimony at trial addressed directly the nature of the relationship between Marshall Durbin and the catching crews, it appears that Marshall Durbin kept a list of potential catching crew members, called them when there was catching to be done, and paid them according to how often they worked.

10

Marshall Durbin seeks to take advantage cases it claims require a plaintiff discharged as a result of a RIF to prove that she was clearly better qualified than those employees that remained.  See, e.g., Bodenheimer v. PPG Industries, Inc., 5 F.3d 955 (5th Cir. 1993); Walther v. Lone Star Gas Co., 952 F.2d 119 (5th Cir. 1993).

The lynchpin of this argument is Marshall Durbin's interpretation of Bodenheimer and Walther.  We find Marshall Durbin's reading of these case rather creative.  Nothing in these cases requires every employment discrimination plaintiff terminated as a result of a RIF to prove that she was clearly better qualified than younger employees not fired in the RIF.  Walther upheld a jury verdict for an ADEA plaintiff on the grounds that evidence of his superior qualifications, together the employer's concessions that it did not release less qualified and more youthful employees previously occupying comparable positions, rebutted the employer's RIF defense.  Our observation that "the issue is not whether [the plaintiff] or the retained employees were better qualified," 952 F.2d at 123, merely pointed out that an employer firing an ADEA plaintiff because of an erroneous belief that the plaintiff's qualifications were inferior has made a bad business decision, not violated the ADEA.  Similarly, in Bodenheimer, we held only that the plaintiff's failure to present any evidence comparing his own qualifications to that of a retained employee allowed the district court to enter summary judgment for the defendant in the specific context of that case.  Nothing in that case established the inflexible rule that Marshall Durbin espouses in this appeal.

11

Most importantly, however, after our decision in Rhodes, we must maintain our focus only upon the ultimate issue: whether the evidence was sufficient to allow the jury to find that Marshall Durbin discharged Mr. Babb because of his age. In such a context, continuing to think in terms of the McDonnell Douglas-Burdine minuet after the defendant has danced the second step clouds, rather than clarifies, the analysis.

With these principles firmly in mind, we find that the evidence was sufficient to allow the jury to infer that age motivated Mr. Babb's discharge. Viewing the case in the light most favorable to Mr. Babb, the evidence confronting the jury was as follows.

First, Marshall Durbin retained Sherrill Moore, who was 39, and fired Mr. Babb, who was in his late fifties, in spite of the fact that Marshall Durbin's witnesses testified that no RIF occurred.

Second, Marshall Durbin's stated reasons for this decision were suspiciously attenuated. Its first justification was a single comment, a stray remark that was never documented,[4] that Mr. Babb supposedly made to his superior to the effect that Mr. Babb could not complete new paperwork requirements. In contrast, both Mr. Babb and his prior superior testified that Mr. Babb had no difficulties with paperwork at all. In addition, no one disputed

---

[4] We note that many of the reasons Marshall Durbin provides to minimize the importance of the McGee stray remark on the inefficiency of older workers, which we have largely accepted in this opinion, apply equally to Mr. Babb's alleged remark.

that Mr. Babb's written evaluations, while identifying other weaknesses in his work skills, never criticized his paperwork, and no one testified that Mr. Babb received oral criticism of his paperwork skills. Marshall Durbin's second justification was that Mr. Babb's catching crews were located at a greater distance from the complex. But this justification conflicted with the way catching crews operated. Testimony from several witnesses established that catching crew members worked for whatever supervisor happened to be available at the time, and that turnover and exchange among groups was rapid. To classify certain catching crew members as belong to Mr. Babb was misleading.

Third, in articulating its justifications for terminating Mr. Babb, Marshall Durbin ignored factors that most rational business entities would consider, such as Mr. Babb's lengthy experience in several aspects of the poultry business and his equally lengthy term of service to Marshall Durbin and its predecessor company. Again, allowing the jury to consider this evidence does not constitute judicial punishment for an irrational business decision. It merely suggests that Marshall Durbin's stated justifications were so thin as to give rise to an inference that post hoc coverup was in place.

Fourth, further evidence allowed the jury to infer that a coverup had taken place at the time of Mr. Babb's termination. When Mr. Babb returned to Marshall Durbin shortly after his discharge and asked for his personnel file, the documents he was given were decidedly incomplete. When Mr. Babb's wife asked the

13

supervisor why the termination had taken place, the supervisor said that he could not tell her.  In short, the jury could conclude from this evidence that Marshall Durbin was hiding something, and the remainder of the evidence allowed the jury to find that the "something" was age discrimination.  Under such circumstances, we hold that a rational jury could find that Marshall Durbin's RIF defense, a defense its own witnesses undermined by stating that no RIF ever occurred, was a pretext for age discrimination.  For these reasons, we AFFIRM.

Regarding the request of attorneys for appellees for fees in defending the judgment below on appeal, we REMAND to the district court for factual findings and conclusions of law on this issue.

AFFIRMED on merits, attorneys fees issue REMANDED.